IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Civil Action No.: 1:20-cv-1072

MARTHA HOELZER and all similarly situated individuals,
                    Plaintiff,

v.

THE BOARD OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA, THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL and RAYMOND FARROW, in his individual and official capacity, BARBARA J. STEPHENSON, in her individual and official capacity, and DANIEL LEBOLD, in his individual and official capacity,

                    Defendants.

**COMPLAINT**
**CLASS ACTION**
**JURY TRIAL DEMANDED**

## NATURE OF THE ACTION

1.      This is an action by Plaintiff Martha Hoelzer ("Hoelzer") under Title I of the Americans with Disabilities Act (ADA) of 1990, as amended, (42 U.S.C. 12101 et seq.) and under the North Carolina Persons with Disabilities Protection Act (N.C. G.S. § 168A-1 et seq.) to redress disability discrimination and correct unlawful employment practices by Defendant University of North Carolina at Chapel Hill ("UNC-CH") against Hoelzer because of her disability.  All references to the ADA in this Complaint shall be understood to also refer to all State law claims arising under Chapter 168A of the North Carolina General Statutes.

2.      This is also an action under the Family and Medical Leave Act (FMLA), 29 U.S.C.A. §§ 2601 et seq., to redress acts of interference with FMLA rights, and also to

redress acts of discrimination and retaliation by UNC-CH based on Plaintiff's need for, and receipt of, FMLA.

3.     This is also an action brought against the Board of Governors of the University of North Carolina with regard to its constituent institutions and the University of North Carolina at Chapel Hill, one of the constituent institutions, pursuant to § 1983 of Title 42 of the United States Code Annotated (42 U.S.C.A. § 1983) for procedural due process violations suffered by Plaintiff Hoelzer and also by other similarly situated individuals consisting of a class of former employees of the constituent institutions of the University of North Carolina who have been erroneously designated as exempt from the due process protections of the State Human Resources Act (N.C. G.S. Chapter 126) and specifically under N.C. G.S. § 126-5(c1)(8) and as a result, upon involuntary termination and taking of their property rights to State employment, deprived of both pre-deprivation and post-deprivation due process.

## PARTIES, JURISDICTION AND VENUE

4.     Plaintiff Hoelzer was employed by Defendant at the time of the acts alleged in this Complaint and lives in Durham, North Carolina. Plaintiff suffers from a condition known as traumatic brain injury (TBI) as a result of multiple concussions she has experienced.

5.     Plaintiff and others similarly situated to her were entitled to vested property rights after one year of employment under Chapter 126 of the N.C. General Statutes but were deprived of those property rights without due process due to their illegal classification by the constituent institutions of the University of North Carolina as exempt under N.C. G.S. § 126-5(c1)(8) ("Instructional and research staff, information

technology professionals, physicians, and dentists of The University of North Carolina, including the faculty of the North Carolina School of Science and Mathematics") with the approval and under the supervision of the Defendant Board of Governors of the University of North Carolina.

6.     The Board of Governors of the University of North Carolina is now a body politic and corporate, an entity the State of North Carolina, and is capable of suing and being sued, as set out in N.C. Gen. Stat. § 116-3.

7.     Pursuant to N.C. Gen. Stat. S 116-11, the Board of Governors is responsible for the general determination, control, supervision, management and governance of all affairs of the constituent institutions, which includes control over the approval of policies and designations related to the status of employees of the constituent institutions as career state employees under Chapter 126 of the State Human Resources act entitled to due process for the deprivation of the property rights belonging to such employees. Defendant UNC-CH has been and is now one of the constituent institutions of the University of North Carolina as set out in N.C. Gen. Stat. § 116-4 and employed Plaintiff at all relevant times as an employer all relevant statutes.

8.     At the time of Plaintiff's termination, Defendant Raymond Farrow, the associate provost for global affairs and the interim chief global officer, supervised UNC Global.

9.     Defendant Barbara Stephenson is the Current Vice-Provost for Global Affairs and the Chief Global Officer and as such exercises supervision over the UNC Global Organization (UNC Global) which is organized and falls under the auspices of the UNC-CH Office of the Provost.

10.     Defendant Daniel Lebold was Plaintiff's supervisor at the time of her termination and was then and currently serves as the Director of Development for UNC Global.

11.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the action arises under the Americans with Disabilities Act, the Family Medical Leave Act, and the Civil Rights Act of 1871, as amended.

12.     This court also has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), as Plaintiff Hoelzer is a resident of the Middle District of North Carolina and Defendant UNC-CH is located in the Middle District of North Carolina and where Defendants Stephenson, Farrow, and Lebold work for UNC-CH; and under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to this action occurred in the Middle District of North Carolina.

## STATEMENT OF CLAIMS

14.     More than thirty (30) days prior to the institution of this lawsuit, Hoelzer filed a Charge with the Equal Employment Opportunity Commission alleging violations of Title VII and Title Plaintiff Hoelzer of the ADA by Defendant. Plaintiff was issued a right to sue letter on September 3, 2020. All conditions precedent to the institution of this lawsuit have been fulfilled.

15.     Defendants discharged Hoelzer from her position as a development officer for UNC Global because of her disability and discriminated against her in violation of the ADA.

16.     Defendants also discharged Hoelzer from her position as a development officer for UNC Global and retaliated against her because she took leave and requested a reasonable accommodation for her disability in violation of the ADA.

17.     Defendants also failed to engage in the interactive process in good faith and provide Plaintiff with a reasonable accommodation for her disability in violation of the ADA.

18.     Defendants deprived Plaintiff of her rights to both pre-termination and post-termination due process to which she was entitled under State and federal law prior to depriving her of property in violation of her constitutional rights.

19.     All allegations of each paragraph of this Complaint are incorporated into each Count thereof, as though fully set out therein.

## STATEMENT OF FACTS

## BACKGROUND

20.     Plaintiff Hoelzer was initially hired as a part-time temporary worker for UNC in 2002 as a researcher in a joint position between the School of Nursing and the Geography program.

21.     On July 2, 2002, Plaintiff Hoelzer was involved in a car accident while working for UNC which caused significant injuries, and was hospitalized until July 21, 2002.

22.     Plaintiff Hoelzer sustained her first concussion during the 2002 car accident, along with many other injuries.

23.     Defendant UNC-CH accepted responsibility and liability for Plaintiff Hoelzer's injuries under its worker compensation program and provided her with

-5-

benefits thereunder at that time and has continued to do so up to and including the date of this Complaint.

24. In August of 2005 Plaintiff returned to work for UNC-CH at the Kenan Flagler Business School in its IT department as a Helpdesk Technician for approximately 9 months before leaving to work elsewhere in May 2006.

25. On or about May 28, 2010, Plaintiff returned to work full-time at UNC-CH at the Kenan Flagler Business School in its Alumni Relations and Development department working primarily with alumni relations. In December of 2015, Plaintiff Hoelzer sought a new position as a development officer with UNC Global Organization (UNC Global) and was interviewed for the position by Daniel Lebold on or about February 4, 2016.

26. On or about February 22, 2016, Chris Ormsby ("Ormsby") began working at UNC Global as a development officer.

27. On or about February 25, 2016, Plaintiff Hoelzer met with Ormsby for an informal interview for the position.

28. On or about February 27, 2016, Plaintiff Hoelzer suffered a head injury at home, experiencing symptoms of a second concussion,

29. Plaintiff Hoelzer obtained medical treatment on or about February 28, 2016, and was formally diagnosed with a concussion, the effects of which were exacerbated by her first concussion.

30. Plaintiff Hoelzer's FLMA leave began on February 28, 2016.

31. On or about March 9, 2016, Lebold corresponded with Plaintiff Hoelzer regarding her concussion and recovery.

32.     On or about March 11, 2016, Plaintiff Hoelzer submitted a Medical & Parental Leave Request form by and through a friend with whom she was staying because of her inability to live on her own after her concussion.  This request was approved on or about March 22, 2016.

33.     On or about April 1, 2016, Plaintiff Hoelzer met with a neurologist regarding her injuries.

34.     On or about April 1, 2016, Plaintiff Hoelzer corresponded with UNC-CH human resources (HR) to inform UNC-CH that she had not yet received the appropriate paperwork to extend her FMLA leave; in her correspondence she also informed Chariss Sanders Jones in HR that she had not yet received accommodation forms.

35.     On or about April 1, 2016, Plaintiff Hoelzer identified herself as disabled to UNC-CH when she sent an email to Rudy Jones regarding her disability.

36.     On or about April 4, Lebold reached out to Plaintiff Hoelzer regarding her concussion and the status of her recovery and application for the development position with UNC Global.

37.     On or about April 5, 2016, Plaintiff Hoelzer provided documentation pursuant to the Americans with Disability Act to Rudy Jones, including a self-identification of disability form and an accommodation request.

38.     On or about April 12, 2016, Plaintiff submitted FMLA paperwork filled out by her neurologist to Rudy Jones and the HR office.

39.     On or about April 14, 2016, Plaintiff Hoelzer interviewed for the development position at UNC Global with Ron Strauss, Executive Vice Chancellor and Provost & Chief International Officer.

40.     On or about April 15, 2016, Plaintiff Hoelzer interviewed with David Routh (Vice Chancellor for University Development) in the morning, and Cynthia Butler (Senior Associate Vice Chancellor for University Development) in the afternoon, for the development position at UNC Global.

41.     In conversation with David Routh, the topic of Plaintiff Hoelzer's concussion came up, and David Routh commended Plaintiff Hoelzer on her interview considering the circumstances, and recommended that she work with the UNC Gfeller Center for treatment of her concussion

42.     On or about April 25, 2016, Plaintiff Hoelzer met with Denise Bates, another employee of UNC Global development office, for an informal interview.

43.     On or about May 16, 2016, Plaintiff Hoelzer submitted FMLA paperwork to HR and to Rudy Jones for ADA purposes.

44.     On or about May 16, 2016, Plaintiff Hoelzer was instructed by UNC HR to work with Rudy Jones at the ADA office with regard to her accommodation requests.

45.     On or about May 19, 2016, Plaintiff Hoelzer submitted additional ADA paperwork with an accommodation request.

46.     On or about May 20, 2016, Plaintiff Hoelzer received an approval for an extension of her FMLA leave.

47.     On or about May 23, 2016, Plaintiff Hoelzer returned to work with UNC-CH on a part-time reduced schedule.

48.     Between May 23, 2016 and July 8, 2016, Plaintiff Hoelzer's neurologist allowed her to stair-step her hours returning to work, slowly increasing hours over time.

49.     On or about May 31, 2016, Plaintiff received notice that she had been

selected for the UNC Global development position.

50.     On or about June 22, 2016, Plaintiff Hoelzer was seen by a physician at the UNC Gfeller Clinic and they determined that her right eye was having difficulty converging inward properly; as a result, she was referred to a medical provider who works with concussed patients for further treatment.

51.     On or about July 8, 2016, Plaintiff Hoelzer corresponded with Rudy Jones at the ADA office to inform him that she would be leaving her current role but returning to UNC in a new role.

52.     On or about August 29, 2016, Plaintiff Hoelzer started at UNC Global as a full time employee and she was told that she was exempt from the protections of the State Human Resources Act (or EHRA).

53.     Plaintiff Hoelzer was hired by and supervised by Daniel Lebold, Director of Development for UNC Global.

54.     At the time of her hiring, Plaintiff Hoelzer continued to suffer from concussion symptoms and was continuing to receive treatment for both her concussion and her original worker's compensation injury.

55.     On August 31, 2016, Plaintiff saw a physician who referred her for vestibular therapy.  The vestibular system is an system that begins in the inner ear and enables the human body to understand where it is in space and provide information to the brain about motion and head position.  It plays a key part in both postural reflexes and eye movements and if damaged, balance, control of eye movements when the head is moving, and a sense of orientation in space are all adversely affected, resulting in problems with vertigo, dizziness, visual disturbance, and/or imbalance which vestibular

-9-

therapy is designed to address.

56.     On September 21, 2016, Plaintiff began vestibular therapy.

57.     In the fall of 2016, Plaintiff Hoelzer had successes in her job, including planning an alumni event in Spain attended by the then chancellor, and coordinating with her colleague Chris Ormsby to utilize a source of data maintained by Defendant called "Davie" which was used for data mining.

58.     Davie is the donor database that maintains donor information – gift amounts, frequency, contact information, and allows development officers to insert information about donor interactions to share with colleagues and to measure metrics.

59.     Hoelzer also successfully put together a live-stream event that could be attended in person or remotely in addition to assisting with a Global Leadership Council ("GLC") meeting in October. The GLC is comprised of a group of successful international business leaders, policy experts, innovative entrepreneurs, and philanthropists committed to providing strategic financial support for UNC's global mission and who met on a regular basis. Plaintiff Hoelzer also took proactive steps to attempt to broaden the scope of her fundraising for the Chancellor's Global Education Fund ("CGEF") in collaboration with Carolina Annual Giving ("CAG").

60.     Plaintiff's efforts to make some changes in how UNC Global accomplished its development goals were eventually rejected by Lebold because of his desire to keep things "internal" for control and because he believed that the folks at CAG didn't "get" the global concept.

61.     When Hoelzer reached out to CAG for assistance with the annual fund process, because she hadn't put together an annual appeal before, she was told they

could not help because they were short staffed. Lebold did not provide her with any guidance in putting together an annual appeal either.

62.    Hoelzer completed the training offered to her as a general part of UNC development in fall of 2016, and was informed that Lebold would provide additional goals and instructions with regard to her specific focus for UNC Global.

63.    Hoelzer was proactive in scheduling meetings with Lebold to review goals and instructions, however Lebold often overlooked or failed to attend meetings scheduled by Hoelzer or scheduled other meetings or activities which conflicted with meetings requested by Hoelzer.

64.    During the fall of 2016, Hoelzer was presented with broad objectives by Lebold and was not provided with any specific information about past fundraising goals or other metrics in order to measure her job performance or to set goals going forward.

65.    Between October of 2016 and February of 2017, Hoelzer continued to be provided with little direction as to the specific goals of her job, even when she requested it, and Lebold continued his behavior of failing to attend meetings scheduled by Hoelzer regarding goals.

66.    Between October of 2016 and December of 2016, Plaintiff Hoelzer managed multiple solicitation projects simultaneously, successfully raised money for UNC Global, and was also asked to help transition the CGEF to a different part of UNC-CH. This set of tasks involved coordinating with many donors and different units on campus to facilitate the change. She also successfully sent out the CGEF fall appeals and the separate Passport-to-Go solicitations. During this time the CGEF solicitations were delayed.

67. On or about January 30, 2017, Plaintiff Hoelzer was discharged from vestibular therapy.

68. No formal mid-year review was conducted by Lebold, but a team planning meeting occurred in January at which the following 18 month strategy was discussed and Plaintiff prepared documentation for that meeting.

69. In June of 2017, Lebold met with Plaintiff Hoelzer to provide her with a year-end review and provided an overall positive review.

70. In June of 2017, Plaintiff Hoelzer met with individuals connected to CAG to discuss global plan for mailings, and corresponded with CAG about the potential to raise awareness about the CGEF in a campus wide email, and with Carolina Annual Fund ("CAF") about CAF plan dates for the upcoming fiscal year.

71. On or about August 9, 2017, Plaintiff Hoelzer and Lebold traveled to Greensboro and Charlotte to visit with donors. Although Lebold was in charge of supervising Plaintiff Hoelzer and training her, this was the one and only time she was provided with training on 1:1 meetings with donors, almost a year after her initial hire.

72. In late summer of 2017, Plaintiff Hoelzer, along with another employee, discussed concerns regarding appropriate training and review and raises by Lebold. She and the other employee suspected that Lebold's lack of organization and attention to detail probably resulted in the fact that UNC Global development employees were not properly included in the group of employees considered for raises because their reviews had not been submitted by Lebold for consideration. Plaintiff and her colleague were aware that Lebold had received training which consisted of the training that he was supposed to be providing to Plaintiff and her colleague, but at no time did Lebold

convene Plaintiff and her colleague and go over any specific training. In September and October of 2017, Plaintiff Hoelzer participated in UNC's campaign launch and Lebold commended Plaintiff Hoelzer for her work on the project and referenced that there would be a mid-year review in January 2018. Plaintiff also assisted with the GLC meetings that occurred during the UNC general campaign launch. During this time, Plaintiff also worked with a donor to set up a scholarship in his and his wife's name. Not only did Plaintiff accomplish these matters but she did so while incorporating Defendant Lebold's last minute ideas and suggestions. Hoelzer was able to not only produce materials needed to help have a successful campaign launch and GLC meeting, but helping out with these matters delayed her ability to keep the CGEF moving along as originally scheduled.

73.     In Fall of 2017, there were delays with the CGEF mailings again resulting from the fact that Plaintiff Hoelzer had not been adequately trained on how to put together a marketing plan for the fund which included the mailing details. Defendant Lebold inconsistently critiqued Plaintiff's outlines as either too detailed in some cases, or in other cases, not detailed enough.

74.     Furthermore, Lebold made changes to the CGEF plan which required either huge shifts in direction or involved time intensive last minute requests or sometimes both. For example: In fall 2017, Lebold requested that Plaintiff Hoelzer re-print the fall appeal for the GLC members, due to a desired change in request amount. This caused a delay to a particular segment of the mailing which he subsequently criticized Plaintiff for causing.

75.     In 2018, when Plaintiff Hoelzer followed the directive from fall 2017

regarding the dollar amount to ask of GLC members, Lebold changed his mind and reverted to the originally suggested amounts from Plaintiff Hoelzer in 2017, again delaying the mailing.

76.     In the October and November of 2017, Plaintiff Hoelzer continued to receive fragmented direction and unreasonable and untimely requests for changes from Lebold which delayed mailings.

77.     Sometime in or around the end of January 2018, Chris Ormsby left UNC Global Development and went to work elsewhere.  Jennifer Hertig, a prospect management analyst, sent Lebold an email about how Ormsby's development portfolio should be managed as a result of his departure.  Lebold forwarded the message to Hoelzer and Denise Bates, at that time the only other two employees in the UNC Global development office.

78.     In January of 2018, Lebold requested at the last minute that Plaintiff Hoelzer participate in a STAR project with the UNC Kenan-Flagler business school because the project was in danger of completely collapsing, and Plaintiff Hoelzer obliged and shifted her schedule to be present over the weekend with only a few days' notice.

79.     On or about January 22, 2018, shortly after Hoelzer pitched in to assist with the STAR project, Lebold provided Plaintiff Hoelzer with another positive mid-year review.  He especially congratulated her on her work on the STAR project and noted that the global development staff had worked well together as a team for the first time. At that time, the team consisted of Lebold, Hoelzer, and Bates.

80.     Via email on January 28, 2018, Defendant Lebold told Plaintiff that she would need to help pick up responsibilities that Ormsby had been doing now that he was

gone and that Lebold would really need a "major gift officer" to help with a variety of tasks that would be coming up. At a meeting on January 29, 2018, Lebold and Plaintiff Hoelzer had a discussion about global fund development upcoming projects they outlined a number of different projects and many sublayers that needed to be accomplished.

81. On February 12, 2018, Plaintiff Hoelzer was rear-ended on her way home from work. Plaintiff did not immediately realize that she had suffered another concussion.

82. On February 14, 2018, after experiencing symptoms which she knew were associated with a concussion, and due to her past history of concussions, she met with her physicians who referred her for x-rays. Later that day she went to the UNC ER where she received a formal diagnosis of a concussion, which would be her third.

83. On February 14, 2018, Lebold asked how Plaintiff Hoelzer was feeling. In response, she provided a doctor's note and requested that she be contacted by phone rather than email, due to the concussion, and her need to not use her eyes on a screen any more than absolutely necessary.

84. Plaintiff Hoelzer was out on FMLA leave from February 14, 2018 until April 4, 2020, on continuous full-time leave due to her concussion.

85. During her leave, she requested that Lebold call her rather than email her, which request was ignored when Lebold continued to send emails.

86. While on leave, Plaintiff Hoelzer continued to try and keep her projects moving forward, receiving limited support from others in development and Lebold denied her request to work from home. Despite it being hard to look at screens, Plaintiff

emailed several documents along to keep projects moving in mid-February and the beginning of March. After doing so, she tried hard not to work and just spend time healing from her injury.

87. On or about March 26, 2018, Plaintiff Hoelzer provided UNC-CH with a doctor's note requesting reasonable accommodations for her concussion.

88. On or about March 27, 2018 Plaintiff Hoelzer filled out a work accommodation form and submitted it to Christina Terminello and Rudy Jones.

89. On or about March 28, 2018 Plaintiff Hoelzer submitted a self-identification of disability.

90. On April 5, 2018, Plaintiff Hoelzer returned to work part-time and with restrictions, specifically that she was allowed to return to work for four (4) hours only a day excluding breaks. Plaintiff remained on FMLA for the other four hours of the day.

91. Upon her return Lebold and Plaintiff Hoelzer had a meeting to discuss her return to work. During this meeting Lebold and Hoelzer discussed that it would take some time for Plaintiff Hoelzer to work through her old email, and that she would need assistance managing her top donor and his scholarship gifts. Plaintiff was still engaging in vision therapy during this time and found it exhausting and slow-going due to issues with her vision.

92. In addition, upon her return on April 5, 2018, although still under restrictions, Lebold encouraged Plaintiff Hoelzer to attend an event at the Carolina Inn to meet a donor. Plaintiff Hoelzer attempted to explain how challenging that would be considering her concussion and its effect on her sensory perceptions, but Lebold failed to recognize that this was a serious issue for Hoelzer.

93. From April 5, 2018 until June 4, 2018, Plaintiff Hoelzer worked four hours a day in line with her restrictions and continued to see medical professionals to treat her symptoms.

94. Soon after her return to work in April, Plaintiff Hoelzer was informed that a contract employee, would be responsible for the spring mailing as Plaintiff Hoelzer was out with a brain injury. Defendant Lebold had actually hired a temporary employee sometime in March and confirmed on Plaintiff Hoelzer's first day back in the office that the temporary employee would work on the spring appeal with the development office though June 2018. This was a huge relief to Plaintiff because of her remaining recovery issues and her time out of the office.

95. However, approximately two (2) weeks after Plaintiff Hoelzer returned to work, on April 18, 2018, Lebold informed Plaintiff Hoelzer that the contractor's last day would be April 19, 2018. Plaintiff Hoelzer had not been involved in the spring appeal up to that point and did not know what the status of the project was.

96. The contractor did stay on until April 20, 2018, in order to help transition the project to Plaintiff Hoelzer. Even with this additional day for transition, issues with this project began to arise as Plaintiff Hoelzer continued to work on a restricted schedule.

97. In April and May of 2018, Lebold continued to ask Plaintiff Hoelzer to complete projects and deliverables in unreasonable timeframes, particularly considering her reduced work schedule and her vision related disability, including time-consuming tasks of pulling together lists of particular donors and statistics. Chris Ormsby had still not been replaced during this time and the development office remained short-staffed.

98.    On April 26, 2018, UNC HR sent out an email directed to EHRA Non-Faulty Employees regarding changes to the procedures for   Annual Performance Appraisals for EHRA Non-Faculty Employees and which provided that existing instruments used by various UNC-CH departments would be used "**as long as the document includes a final overall rating and the rating is communicated in writing to the employee.**" The quoted language was bolded and included in red text standing out from the black text in the rest of the email.

99.    On or about May 3, 2018, Plaintiff Hoelzer provided a doctor's note to Rudy Jones and Christina Terminello which extended the four hour a day work restriction, but noted that June 5-6 could be six hour days.  Plaintiff was still engaged in vision therapy which had started in February and ended sometime in June to help her address her vision issues.

100.    On or about May 10, 2018, Plaintiff Hoelzer provided Lebold with a list of her current projects which were designed to reach a year end goal of $350,000.

101.    On or about May 14, 2018, Plaintiff Hoelzer provided Lebold with an outline of "Davie goals," and provided a working outline of the same.  "Davie goals" were a short-hand for fundraising goals and metrics. The metrics included things such as number of donor visits/contacts, amount raised, and categories of amounts. A development employees was required to evaluate the employee's portfolio of donors to determine how many gifts were anticipated to be made in these different ranges, for example in categories such as $1000-$1999, $2000-$2999, $10,000-$24,999, etc.  Donors were then "qualified" and proposals created for them to consider and put into the Davie system.  If a donor made a pledge or made a cash payment, then that information would

-18-

be entered into Davis as either cash or commitment.

102.  On or about May 17, 2018, Lebold was informed that the printed CGEF mailing would not go out until just before the end of the year. Delays in this printing and mailing were due to the fact that additional staffing was not provided to help maintain deadlines while Plaintiff Hoelzer worked reduced hours as required by her doctor.

103.  On June 6, 2018, Plaintiff Hoelzer shared a status report on CGEF gifts, and Lebold responded "things are looking good for a strong finish. I think we're in striking distance to goal. Thanks for the update! Daniel"

104.  Between April 5, 2018 and June 6, 2018, Plaintiff Hoelzer's FMLA and ADA accommodations were extended several times. On June 5 and 6, Plaintiff worked two 6 hour days, taking 2 hours of FMLA on each of those days.  On June 7, Plaintiff returned to full-time work taking FMLA for intermittent medical appointments. Plaintiff also engaged in vestibular therapy again between April 5 and June 6.  On May 25, 2018, Plaintiff also began physical therapy.

105.  On June 7, 2018, Plaintiff Hoelzer was released to work and did return to work full-time with continuing intermittent FMLA appointments.

106.  On or about June 8, 2018, Plaintiff Hoelzer and Lebold met for Plaintiff Hoelzer's year-end review ("2018 Review meeting"). At the time of the 2018 Review, Plaintiff Hoelzer was continuing to seek medical treatment for her traumatic brain injury.

107.  During the 2018 Review meeting, Lebold informed Plaintiff Hoelzer that she was not meeting expectations for the job, that he understood she was working hard,

but perhaps the current role was not the best fit. He stated that the job was not going to change.

108. During the 2018 meeting, which was before the total close of the fiscal year by roughly three weeks, Plaintiff Hoelzer provided statistics that she had raised, in total $647,411.37 to date, which was 94.13% of her total goal which occurred during the time she was in the office but also during the period of time when she was both not in the office and also working only part-time. After the fiscal year ended on June 30, 2018, Plaintiff had actually exceeded her goal by 101% with total gifts of $696,819.37.

109. During his review, Lebold did not acknowledge that Plaintiff was completely out of work for seven weeks of the review period and working on half-time for another eight weeks of it. Lebold failed to explain to Plaintiff exactly how her she was failing to meet his expectations during this time period given her acceptable mid-year review on January 28, 2018. In his comments, however, Defendant Lebold clearly contemplated that perhaps her current role was not the best fit for her abilities, but that the job wasn't going to change. Plaintiff told Lebold clearly and unequivocally that she was still suffering from a brain injury and that she needed some assistance in performing the duties of her position.

110. Lebold then left the office and did not return until July 9, 2018. To Plaintiff's knowledge, he did not formalize Plaintiff's evaluation before he left. He did not provide Plaintiff with a copy of his formal evaluation at any time, but only a draft evaluation.

111. During Defendant Lebold's absence from the office, Plaintiff continued to follow up with the UNC ADA office. She continued her vision therapy through June 18.

112. On or about June 25, 2018, Plaintiff Hoelzer met with a neurocognitive psychologist who noted that Plaintiff Hoelzer might have some ADHD like symptoms due to her concussions, and referred Plaintiff Hoelzer to a cognitive coach for treatment.

113. On or about June 26, 2018, Plaintiff Hoelzer, Plaintiff had a meeting with Rudy Jones, Associate Director of the Equal Opportunity and Compliance Office to discuss the Accommodation Policy and Process. This was Plaintiff's first time meeting him face-to-face. Plaintiff also inquired about the possibility of finding another position at the University that would be more accommodating of her brain injury and FMLA needs. Jones indicated that he did not know about that but that he would make inquiry and let her know.

114. Plaintiff referenced that she was continuing to receive worker's compensation services toward the end of the meeting and Jones sounded surprised and was unaware that she was under workers compensation as a part of her prior role at UNC.

115. Plaintiff never heard back from Jones with regard to her inquiry about transferring to other positions within UNC. She did attempt to follow-up by telephone on at least two other occasions.

116. At this point, Plaintiff had still not received her formal review for the fiscal year July 1, 2017 to June 30, 2018. Plaintiff was scheduled go on vacation on July 31 and this vacation had been approved by Lebold. Knowing that she was leaving at noon, Lebold scheduled a meeting with Plaintiff and actually told her that he had given her a "does not meet expectations" in her formal review. Lebold did not provide Plaintiff with a copy of the review but only a draft version printed out.

117. Subsequently, although Plaintiff never received a formal copy of the final review, she did learn that Defendant Lebold had made some revisions to the draft he provided her on July 31 based on their discussion. In an email on July 31, Defendant Lebold told Plaintiff that the formal review was in her mailbox for her to review, knowing full well that Plaintiff had already left the office for vacation. Defendant Lebold never sent Plaintiff an electronic version of the appraisal, nor was it in her mailbox when she returned from vacation.

118. On information and belief, Defendant Lebold waited until the last minute to submit it knowing it was due on July 31, 2018. He then submitted it indicating that Plaintiff Hoelzer had "refused to sign." In fact, Plaintiff Hoelzer had refused only to sign the "draft" version that contained incorrect statements of fact. Plaintiff was never provided an opportunity to review the final version nor an opportunity to sign it prior to Lebold's submission of it even though Lebold told her to send her modifications via email and he would incorporate them and then she could sign the document.

119. The negative review delivered by Lebold on July 31, 2018, was the impetus for the Performance Improvement Plan (PIP) delivered to Plaintiff on December 14, 2018.

120. Plaintiff never received any written warnings or counseling sessions at any time during her employment with UNC Global and specifically she received none between the June 6 review meeting and the PIP on December 14, 2018.

121. In August 2018, Plaintiff assisted a colleague in planning a successful alumni event in Bogota, Columbia.

122. The ADA office provided Plaintiff with a professional organizer to address

issues identified by Plaintiff. The ADA office did not however discuss a job change with Plaintiff or indicate that other positions within UNC-CH might be available.

123. During the fall, Plaintiff also created a table of CGEF giving amounts for Lebold and worked with Casey Privette at CAG to refine reports included in the table. She also worked on the fall giving appeal and other development events such as the passport postcard and the GLC invitation list and helped with the GLC weekend event. Plaintiff also worked on an alumni event in India and on a campaign roadshow event that Lebold planned to attend in other cities. Plaintiff also assisted several other colleagues: Carson Walburn, by providing information for trip to Southeast Asia and Spain; Joon Cho, by providing information for a trip to South Korea; Mary Margaret Carroll and Kavita Hall, by providing information for several trips to India. Plaintiff herself visited donors in Seattle, Alabama, and locally and maintained all of her own development responsibilities as well. In October, an email from Carroll informed Plaintiff that Carroll had "made a huge deal about" Plaintiff to her team and indicated that there were as a result "18 more people that know of your great work and talent."

124. In addition to all the other projects on which Plaintiff worked during her time at UNC Global, Plaintiff spent many, many hours working on the Gang Pei scholarship. Beginning in the fall of 2017 and throughout 2018, Plaintiff worked with the donor who commended Plaintiff for her work and who in fact criticized Plaintiff's colleague who was "helping" with the scholarship while Plaintiff was out of work. Plaintiff's work on the scholarship continued up to the day she was terminated by Defendant Lebold.

125. Nevertheless, despite all of her work and the praise she received for it, on

December 14, 2018, Lebold and Lisa Waldeck, UNC HR, presented Plaintiff with a Performance Improvement Plan despite a lack of any written negative feedback from Lebold during that time period.

126.    Six weeks later, during Plaintiff's mid-year review on January 31, 2019, Plaintiff provided Lebold with a comprehensive listing of her accomplishment between July 31, 2018 and January 1, 2019. The meeting did not conclude and was scheduled to re-convene on February 6, 2019. At the February 6, 2019, Plaintiff provided Lebold with a response/rebuttal to the December PIP that she had been issued. This meeting was also cut short. Plaintiff sent an invitation to finish the meeting for February 11 and Lebold rejected that date and requested to meet on February 22.

127.    On February 12, 2019, Plaintiff was informed by Rudy Jones, with the ADA office, that her department had denied a request to allow her to move to positions within her department and that as a result she could look for positions in other departments with UNC-CH. On this same day, Plaintiff began speech therapy and on February 13, 2019, Plaintiff updated the ADA office with information about her speech therapy diagnosis.

128.    Also on February 13, Lebold sent Plaintiff a request that Lisa Waldeck with HR be added to the February 22 meeting with Plaintiff.

129.    On February 22, Lisa Waldeck and Lebold met with Plaintiff and informed her that she was an "at will" employee and that her employment was ending. Lebold left the meeting immediately after terminating Plaintiff and Waldeck continued to discuss the process for termination with Plaintiff.

## COUNT ONE:  DISCRIMINATION BASED ON DISABILITY
## (FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS)

130.    Defendant Hoelzer has a traumatic brain injury which is a disability as defined in 42 U.S.C. § 12102(2).

131.    Plaintiff Hoelzer requested a reasonable accommodation for her condition while working for UNC Global after her February 2018 concussion.

132.    Defendants failed to engage in the interactive process with Plaintiff in a meaningful manner in that it failed to consider whether other positions were available to her with Defendants, and imposed terms and conditions on Plaintiff's employment which were unreasonable and designed to be unattainable in order to provide Defendants with pretextual reason to terminate Plaintiff.

133.    This failure to engage in the interactive process in a meaningful manner constituted discrimination based on Plaintiff's disability.

134.    Plaintiff Hoelzer has suffered damages as a result of Defendant's violation of the ADA.

## COUNT TWO:  DISCRIMINATION BASED ON DISABILITY
## (FAILURE TO ACCOMMODATE)

135.    Defendant Hoelzer has a traumatic brain injury which is a disability as defined in 42 U.S.C. § 12102(2).

136.    Defendant terminated Plaintiff Hoelzer's employment because she suffered from this disability.

137.    Plaintiff Hoelzer's termination violated the ADA.

138.    Plaintiff Hoelzer has suffered damages as a result of Defendant's violation of the ADA.

## COUNT THREE:  RETALIATION
## (FOR REQUESTING A REASONABLE ACCOMMODATION UNDER THE ADA)

139.   Defendant Hoelzer has a traumatic brain injury which is a disability as defined in 42 U.S.C. § 12102(2).

140.   Plaintiff requested an accommodation under the ADA including transfer to another position within UNC-CH.

141.   Defendant denied her request and terminated her in retaliation for requesting an accommodation under the ADA .

142.   Plaintiff's termination violated the ADA.

143.   Plaintiff has suffered damages as a result of Defendant's violation of the ADA.

## COUNT FOUR: FMLA VIOLATION
## (RETALIATION)

144.   Plaintiff Hoelzer had a traumatic brain injury, which is a serious medical condition  under the FMLA.

145.   Plaintiff requested leave under the FMLA.

146.   Defendant terminated her in retaliation for requesting and taking leave under the FMLA.

147.   Plaintiff's termination violated the FMLA.

148.   Plaintiff has suffered damages as a result of Defendant's violation of the FMLA.

## COUNT FIVE:  42 U.S.C. § 1983
## (DEPRIVATION OF DUE PROCESS)

149.   Plaintiff was an employee of the Defendant UNC-CH and was under the supervision of the named individual defendants Lebold and Farrow.

150.   Plaintiff was improperly classified as exempt from the State Human Resources Act in that she was not either "instructional and research staff, information technology professionals, physicians, and dentists of The University of North Carolina" nor was she an employee who salary "fixed under the authority vested in the Board of Governors of The University of North Carolina by the provisions of G.S. 116-11(4), 116-11(5), and 116-14" in that she was not a chancellor or vice-chancellor of an institution, nor a senior academic and administrative officers nor person having tenure whose salary is fixed by the Board.

151.   Plaintiff had a property interest in her employment due to her status as a career state employee under N.C. G.S. § 126-1.1.

152.   Plaintiff's termination deprived her of that property without any pre-deprivation or post-deprivation due process.

153.   Plaintiff's constitutional rights have been violated as a result of Defendants' actions.

154.   Plaintiff has suffered damages as a result of the Defendants' unconstitutional deprivation of her civil rights.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays that this Court:

1.     That this Court issue an injunction directing the Defendants, including

Defendant Stephenson, as the current Vice Provost of Global Affairs, to reinstate Plaintiff Hoelzer;

2. That this Court enjoin the Defendant UNC-CH from discriminating on the basis on disability and against employees taking FMLA leave in the terms and conditions of employment;

3. That this Court enjoin the Defendants from retaliating against employees who protest illegal discrimination and retaliation in the terms and conditions of employment;

4. That this Court enjoin the Defendants from improperly classifying employees who are not research or instructional staff or otherwise have their salaries set by the Board of Governors under Chapter 116 from being treated as exempt from the N.C. G.S. Chapter 126, the State Human Resources Act, and instead provide these employees with all pre-deprivation and post-deprivation due process to which they are entitled under the law;

5. That this Court order Defendants to make whole Plaintiff Hoelzer by providing her with appropriate lost earnings and other lost benefits, with prejudgment interest, in amounts to be proved at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including, but not limited to, reinstatement, back pay, front pay, and attorneys' fees;

6. That this Court order Defendants to make whole Plaintiff Hoelzer by providing compensation for pecuniary losses, including, but not limited to, costs incurred for health and life insurance premiums and costs of seeking new employment, in amounts to be determined at trial;

7.     That this Court order Defendants to make whole Plaintiff Hoelzer by providing compensation for nonpecuniary losses, including emotional pain, suffering, inconvenience, and mental anguish in amounts to be proven at trial;

8.     That this Court order Defendant UNC-CH to institute and carry out policies, practices, and programs which provide equal opportunities to qualified individuals with disabilities, and which eradicate the effects of past and present unlawful practices;

9.     That this Court award the plaintiff reasonable attorney's fees and the other costs of this action;

10.     That this Court award Plaintiffs such other and further relief as may be just and equitable.

## JURY TRIAL DEMANDED

Plaintiffs request a jury trial on all questions of fact raised by the Complaint.

Respectfully submitted, this the 1st day of December 2020.

/S/ VALERIE BATEMAN
NC State Bar: 13417
T/F 919-436-3592
valerie.bateman@forrestfirm.com

/S/ RACHEL M. BLUNK
NC State Bar: 42694
T/F 336-663-1052
rachel.blunk@forrestfirm.com

FORREST FIRM, P.C.
406 Blackwell St., Suite 420
Durham, NC 27701
Attorneys for Plaintiffs

## VERIFICATION OF MARTHA HOELZER

MARTHA HOELZER, being duly sworn, deposes and says:

That the contents of the foregoing Complaint about which She has knowledge are true to her own knowledge, except as to matters stated on information and belief, and as to those matters, She believes them to be true.

MARTHA HOELZER

Subscribed and sworn to before me this day

By Martha Hoelzer

on the 1st day of December 2020.

NOTARY PUBLIC

My Commission Expires:

12/1/2021